**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**MARY A. DETZLER,**

        **Plaintiff,**        **CIVIL ACTION NO. 12-cv-14133**

  **vs.**

                               **DISTRICT JUDGE PATRICK J. DUGGAN**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

        **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Mary Detzler seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to Social Security benefits for her mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment or Remand (docket no. 17) and Defendant's Motion for Summary Judgment (docket no. 21). The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 5.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

**I.     RECOMMENDATION:**

This Court recommends that Plaintiff's Motion for Summary Judgment (docket no. 17) be DENIED and that Defendant's Motion for Summary Judgment (docket no. 21) be GRANTED.

**II.    PROCEDURAL HISTORY:**

Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Security Income with protective filing dates of July 22, 2009, alleging that she had been disabled since July 21, 2009, due to bipolar disorder and post-traumatic stress disorder (PTSD). (*See* TR 22.) The Social Security Administration denied benefits. (*See* TR 22.) Plaintiff requested a *de novo* hearing, which was held on February 18, 2011, before Administrative Law Judge (ALJ) Peter N. Dowd, who subsequently found that Plaintiff was not entitled to benefits because she was capable of performing her past relevant work as a cleaner. (TR 22-32.) The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced this action for judicial review. The parties then filed their instant Motions.

### III.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

#### A.   Plaintiff's Testimony

Plaintiff was 44 years old at the time of the administrative hearing and 43 years old at the time of alleged onset. (*See* TR 45.) Plaintiff testified that she had finished high school, but she did not attend college. (TR 45.) Plaintiff has previously worked as cashier, a building cleaner, and a security guard. (TR 49-50.) She testified that she worked through August 2009 and that she stopped working as a security guard at that time because she "couldn't handle the pressure . . . out there anymore." (TR 50-51.) She acknowledged, however, that she was fired because of "[her] attitude." (TR 52.) At the time of the hearing, Plaintiff was single, but she was living with her long-time boyfriend in a home owned by her boyfriend's mother. (*See* TR 46, 53.) Plaintiff's only source of income was through disability payments and food stamps from the State of Michigan. (TR 53-54.)

Plaintiff testified that she suffered from PTSD stemming from physical and sexual abuse that took place when she was a child and from physical abuse by her ex-husband, Joseph Boyd. (TR 55-

56.) She also told the ALJ that in 1999, her brother came to her home to see if she was ok, at which time Boyd stabbed and killed her brother. (*See* TR 47.) Boyd was convicted of second-degree murder, but he was released in 2008. (*See* TR 55.) Plaintiff testified that, at the time of the hearing, she had "frequent mood swings, poor focus and concentration, anger outbursts, increased irritability, racing thought, hyper activity . . . and difficulties with sleeping." (TR 57.) Plaintiff testified that she had mood swings "three, four times a day" that last "about a half hour." (TR 59.) She told the ALJ that she "just get[s] angry" and that "sometimes [she] smash[es] stuff." (TR 59.) She also told the ALJ that she thought about hurting other people and about hurting herself. (TR 59-60.) When asked, however, Plaintiff testified that she could get along with her boyfriend's mother and that she was able to sometimes relate with other people at work. (TR 63.) In general, she told the ALJ, she could not do work that "involves people contact" because she was afraid that she would hit them if she got angry. (TR 64.) Plaintiff further testified that her concentration problems caused her to start things and not follow through with them. (TR 65.)

Plaintiff testified that she took Abilify and Lithium to alleviate her symptoms, but she told the ALJ that "[t]he Abilify . . . didn't help [her]," so her doctor started her on Seroquel just before the hearing. (TR 58.) She did indicate, however, that the Lithium, which she had been on since 2009, had "been helping a lot." (TR 58.) Plaintiff added that the Abilify and the Seroquel caused her to gain weight. (TR 55.)

Plaintiff testified that she got up around 8:30 a.m. each day and that she went to sleep around 10:30 p.m. (TR 61.) She told the ALJ that she would help take care of the family dog, that she would "sometimes" help with meal preparation, cleaning, and laundry, and that she would use the computer for about 20 minutes a day. (TR 61-62.) She added that she would sometimes go shopping or eat out, but she would "very seldom . . . drive," and she would never go shopping alone

because she "don't like to be around people." (TR 62, 67.) On a typical day, Plaintiff stated, she would spend a lot of time watching television and "just stare of (sic) into space and do nothing." (TR 62.) Plaintiff acknowledged that she watched more television and "chill[ed] out" more than the average person, from her perspective. (TR 63.)

### B. Medical Record

Defendant's account of Plaintiff's medical record appears to be a complete and accurate representation of the same. Plaintiff's account of her medical record, although more succinct, is substantially similar. (*Compare* docket no. 17 at 6-7, *with* docket no. 21 at 6-10.) That is, the parties dispute the weight that the ALJ placed on certain evidence, not the evidence itself. Thus, the Court will herein adopt the following from Defendant's brief:

> On July 21, 2009, Plaintiff underwent a psychiatric evaluation with Anne Tadeo, M.D.. (Tr. 253-54). Plaintiff was working part time for a security company. (Tr. 253). Dr. Tadeo reported that Plaintiff had been receiving mental health treatment since 1991 and was not taking medication. (Tr. 253). Plaintiff's reported symptoms included mood swings, poor concentration, anger, and irritability. (Tr. 253). Plaintiff had no prior psychiatric hospitalization. (Tr. 253). Plaintiff's mental status exam was largely normal aside from some paranoia, poor concentration and memory, and fair insight and judgment. (Tr. 253). Dr. Tadeo diagnosed Plaintiff with bipolar disorder. (Tr. 253).
>
> Bruce Douglass, Ph.D., completed a Mental Residual Functional Capacity ("RFC") Assessment Form on September 16, 2009. (Tr. 255-57). Dr. Douglass indicated that Plaintiff had intact cognition and adaptive functioning but reduced social functioning. (Tr. 257). He opined that Plaintiff might have some trouble with demanding work settings due to concentration problems, and that she would work best alone or in small groups. (Tr. 257). Dr. Douglass indicated that Plaintiff retained the capacity to perform simple, routine, two-step tasks. (Tr. 257). On the Psychiatric Review Technique Form ("PRTF") that Dr. Douglass completed on the same date, Dr. Douglass indicated that Plaintiff had no episodes of extended decompensation and only mild restriction in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace. (Tr. 269). In his notes on the PRTF, Dr. Douglass discussed a June 2009 assessment by a social worker, the July 2009 evaluation from Dr. Tadeo, and Plaintiff's and her boyfriend's reports of Plaintiff's daily functioning. (Tr. 271).

Nurse Practitioner Phil Sweet first examined Plaintiff on August 18, 2009. (Tr. 289). Mr. Sweet noted that Plaintiff worked "part-time up to 35 hours per week" as a security guard. (Tr. 289). Plaintiff complained of being "wound up" and having racing thoughts and poor sleep. (Tr. 289). Mr. Sweet assessed Plaintiff with a Global Assessment of Functioning ("GAF") score of 50.2 (Tr. 289). He prescribed Lithium and Abilify. (Tr. 289).

Plaintiff saw Mr. Sweet for medication reviews four times between September 2009 and January 2010. (Tr. 285-88). On each of those visits, Mr. Sweet assessed Plaintiff with a GAF score of 55.3 (Tr. 285-88). Plaintiff consistently appeared in good spirits and was logical and pleasant. (Tr. 285-88). In October 2009, Plaintiff informed Mr. Sweet that, while she was still working as a security guard, her job was seasonal and would end shortly. (Tr. 287). After adjustments to Plaintiff's medication, she indicated that Mr. Sweet in January 2010 that the Abilify had helped. (Tr. 285-88).

Following Plaintiff's January 2010 medication review, Plaintiff began seeing Mr. Sweet approximately once every three months. (Tr. 282-84). Mr. Sweet assessed Plaintiff with a GAF score of 50 in April 2010 and a score of 55 in July and October 2010, and continued to note that Plaintiff was in good spirits, pleasant, and friendly. (Tr. 282-84). In October 2010, Mr. Sweet noted that Plaintiff was still looking for work notwithstanding her application for disability benefits. (Tr. 282).

Plaintiff established a treatment plan at List Psychological Services in October 2010. (Tr. 291-93). In relevant part, the treatment plan form noted that Plaintiff "love[d] to fish" and was involved in a weekly bowling league. (Tr. 292). Mr. Sweet completed an RFC assessment questionnaire on November 17, 2010. (Tr. 276-79). He diagnosed Plaintiff with bipolar disorder and posttraumatic stress disorder ("PTSD") and assessed a GAF score of 55. (Tr. 276). He indicated that Plaintiff would be "unable to meet competitive standards" in the following areas: (1) working around others without undue distraction; (2) completing a normal workday or work week without interruption from psychological symptoms; (3) accepting and responding to criticism from supervisors; (4) responding to changes in workplace setting; and (5) interacting with the general public. (Tr. 278-79). Mr. Sweet otherwise identified "limited but satisfactory" or "seriously limited, but not precluded" work abilities. (Tr. 278-79). He opined that Plaintiff would miss work an average of over four days per month. (Tr. 279). Dr. Tadeo signed the questionnaire. (Tr. 279).

Plaintiff reported difficulties from her Abilify medication at her medication review with Mr. Sweet in January 2011. (Tr. 281). Mr. Sweet assessed Plaintiff's current GAF score as 50 and adjusted Plaintiff's medication. (Tr. 281). On February 10, 2011, Plaintiff reported to Mr. Sweet that she had ceased taking Abilify four days earlier. (Tr. 299). Mr. Sweet again assessed Plaintiff's GAF score as 50 and adjusted her medications. (Tr. 299).

       Consultative psychologist Michael Brady, Ph.D., examined Plaintiff on March 17, 2011. (Tr. 301-08). He concluded that Plaintiff had moderate limitations in her abilities to understand, remember, and carry out complex instructions and make judgments in complex work-related decisions. (Tr. 301). He indicated that Plaintiff had moderate depression that might disrupt her focus and concentration, moderate difficulties interacting with the public and co-workers, and moderate difficulties responding appropriately to changes in work setting. (Tr. 301). Dr. Brady found Plaintiff had a marked limitation in interacting with supervisors. (Tr. 302). In support of his assessment, he noted that Plaintiff was "very angry and irritable." (Tr. 302).

       In his accompanying evaluation, Dr. Brady reported that Plaintiff "has a very difficult time getting along with people" and "cannot maintain work due to conflicts with her supervisors." (Tr. 304). Dr. Brady concluded that Plaintiff had ongoing struggles with depression and anger. (Tr. 307). However, he disputed Plaintiff's diagnosis of bipolar disorder because her treatment notes contained no evidence of the requisite manic symptoms, and Plaintiff herself denied such symptoms. (Tr. 307). Dr. Brady found that depression accounted for Plaintiff's anger and irritability. (Tr. 307). He reported that Plaintiff had been cooperative and attentive, and that her mental status exam was normal aside from difficulties in concentration. (Tr. 307). He diagnosed Plaintiff with major depressive disorder that was moderate in severity. (Tr. 307). Dr. Brady concluded that Plaintiff's ability to interact with coworkers and supervisors was impaired due to aggressiveness and anger, but that Plaintiff would be able to understand, recall, and complete tasks with no major limitations. (Tr. 307).

       However, he also found that Plaintiff's concentration was impaired and that she might be distracted due to her emotional state. (Tr. 307). Dr. Brady finally concluded that Plaintiff "appears able to deal with normal workplace stressors appropriately and adaptively." (Tr. 307). He assessed Plaintiff's GAF score as 60. (Tr. 307).

(Docket no. 21 at 6-7 (footnotes omitted).)

### C. The Vocational Expert

The VE testified that Plaintiff's past relevant work included work as a security guard, performed at the light level; work as a cashier, performed at the light level; work as a home attendant, performed at the medium level; and work as a cleaner, performed at the medium level. (TR 69-70.) The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and vocational experience who had no known physical limitations but who, from a mental

standpoint, was limited to "only simple routine and repetitive work activities in a stable work environment indicative of the [INDAUDIBLE] to do unskilled work activities and that the individual in a potential work setting could tolerate only superficial contact with supervisors and co-workers but could not or should not work with the general public." (TR 70.) The ALJ asked if such a person could perform any of Plaintiff's past relevant work. (TR 70.) The VE testified that such a person could work as a cleaner and that there were 36,000 such jobs in Michigan at the medium exertional level and 4,300 such jobs in Michigan at the light exertional level. (TR 70-71.) The VE added that there were also positions available at the heavy exertional level but not at the sedentary exertional level. (TR 71.)

The ALJ then asked the VE to assume that such a person "has psychologically based symptoms which would prevent the individual from completing a typical work day or week without interruptions at unscheduled times. (TR 71.) The ALJ asked the VE if such a person could perform competitive work. (TR 71.) The VE testified that such a person would be precluded from employment. (TR 72.) Plaintiff's attorney asked no follow-up questions. (*See* TR 72.)

## IV.  ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff met the insured status requirements of the SSA through June 30, 2011; that she had not engaged in substantial gainful activity since July 21, 2009, her alleged onset date; and that she suffered from severe bipolar disorder with post-traumatic stress disorder. (TR 24-25.) The ALJ further found that her impairments did not meet or equal those listed in the Listing of Impairments. (TR 26-27.) The ALJ found, however, that Plaintiff's allegations regarding the extent of her symptoms were not wholly credible and that Plaintiff had "the maximum physical [RFC] to perform a full range of work activities at all exertional levels but with the following nonexertional limitations: [she was] limited to simple, routine and repetitive work activities

performed in a stable work environment; and [she could] mentally maximally tolerate superficial contact with supervisors and coworkers, but should not work with the general public." (TR 28.) The ALJ then determined, in reliance on the VE's testimony, that Plaintiff was capable of performing her past relevant work as a cleaner. (TR 31.) Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from July 21, 2009, through the date of the ALJ's decision. (TR 32.)

## V. LAW AND ANALYSIS

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial

evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B. Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) Plaintiff was not presently engaged in substantial gainful employment; and

(2) Plaintiff suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

9

**C.     Analysis**

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing.  42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration."  *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).  Plaintiff argues that this matter should be reversed or remanded under sentence 4 because the ALJ improperly weighed the medical opinions of record and, instead, "substituted his own lay opinion for medical professionals."[1] (Docket no. 17 at 8-14.)

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue

---

[1] Plaintiff also asserts that the ALJ "failed to created and (sic) accurate [RFC] assessment that incorporated all of Plaintiff's impairments," but the ALJ is only required to incorporate in a claimant's RFC (and the hypothetical questions to the VE) those limitations that the ALJ finds credible and supported by the record.  *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Here, the ALJ included in Plaintiff's RFC those limitations that the ALJ found credible.  Thus, in substance, Plaintiff's assertion that the RFC is inaccurate is merely a collateral attack on the ALJ's interpretation of the evidence, which is addressed by Plaintiff's primary argument.

10

of disability is reserved to the Commissioner and not the treating or examining physician. *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008). Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)). The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant. 20 C.F.R. § 404.1527(c)(1). The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist. 20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should

be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Additionally, the Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision. *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir.2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Moreover, an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).

Plaintiff asserts that the ALJ erred when he failed to give substantial deference to the opinion provided by Dr. Tadeo and Nurse Practitioner Sweet in their Medical Source Statement.[2] (Docket no. 17 at 9.) Instead, Plaintiff argues, the ALJ relied on a Mental RFC completed by Dr. Douglas, the non-examining doctor who completed his RFC on September 16, 2009, less than two months after Plaintiff's alleged onset date and 18 months before her hearing. (*Id.* at 10.) Defendant asserts

---

[2]Plaintiff also briefly mentions the opinion of Dr. Brady, but Plaintiff does not assert that Dr. Brady's opinion itself was entitled to more weight. Instead, Plaintiff appears to argue that Dr. Brady's opinion supports Dr. Tadeo's opinion and, therefore, Dr. Tadeo's opinion should have been given more weight.

12

that neither Dr. Tadeo nor Nurse Practitioner Sweet is a "treating physician," and therefore, their opinions are not entitled to deference. (Docket no. 21 at 15-16.) Moreover, Defendant contends, even if their opinions were entitled to deference, the ALJ sufficiently articulated his reasons for discounting their opinions. (*Id.* at 17-18.) Defendant further asserts that the ALJ gave sufficient weight to Dr. Brady's opinion and that he permissibly credited Dr. Douglas's opinion. (*Id.* at 19-20.)

As Defendant notes, the treating physician doctrine "is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994). Moreover, a nurse practitioner is not an acceptable medical source. *See* 20 C.F.R. § 404.1513.

Plaintiff does not appear to assert that Nurse Practitioner Sweet was Plaintiff's treating physician; indeed such an argument would fail on its face. Plaintiff does, however, appear to assert that Dr. Tadeo adopted Nurse Practitioner Sweet's opinions as her own and, therefore, the opinion contained in the Medical Source Statement was Dr. Tadeo's opinion. But as the ALJ noted and the records make clear, Dr. Tadeo only saw Plaintiff once, on his initial intake in July 2009. (TR 30, 253-54.) Thus, the Court agrees with Defendant that neither Dr. Tadeo nor Nurse Practitioner Sweet is "treating physician" whose opinion is entitled to deference. Dr. Tadeo's single meeting with Plaintiff could not give her the "deeper insight" into Plaintiff's mental illness that is expected of a physician who treats a patient for "a long period of time."

Nevertheless, the Commissioner recognizes that opinions from sources that are not "acceptable medical sources" may contain valuable information that may be useful in assessing the

13

severity of a claimant's impairments. 20 C.F.R. §§ 404.1513(d); 416.913(d); Social Security Ruling (SSR) 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006). SSR 06–3p clarifies that other source opinions "may be based on special knowledge of the individual" and may be important sources of information in determining the severity of the claimant's impairments and how the impairments affect the claimant's functional capabilities. SSR 06–3p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Here, however, the ALJ did give some (albiet, little) weight to the Medical Source Statement signed by Dr. Tadeo. (*See* TR 31.) Dr. Tadeo opined that Plaintiff was "unable to meet competitive standards" in the following areas: (1) working around others without undue distraction; (2) completing a normal workday or work week without interruption from psychological symptoms; (3) accepting and responding to criticism from supervisors; (4) responding to changes in workplace setting; and (5) interacting with the general public. (Tr. 278-79).

In Plaintiff's RFC, the ALJ limited Plaintiff to repetitive work, superficial contact with supervisors and coworkers, and no work with the general public. Thus, the ALJ accounted for Dr. Tadeo's opinion that she would be distracted by others, that should could not respond to changes in the workplace setting, and that she would not interact well with co-workers, supervisors, or the general public. The only opinion that the ALJ did not accept is the opinion that Plaintiff could not "complet[e] a normal workday or workweek without interruption from psychological symptoms." But as noted, the ALJ was note required to accept Dr. Tadeo's opinion in full.

Moreover, the ALJ gave his reasons for affording Dr. Tadeo's opinions little weight: he found that the limitations were inconsistent with other evidence in the record; that Plaintiff "exhibited significant improvement . . . with regular medication and treatment;" and that even before Plaintiff had any treatment, she was working 35 hours per week with no difficulties. (*See* TR 30-31.) Therefore, although the Court may disagree, the ALJ's decision to give little weight to the

14

Medical Source Statement signed by Dr. Tadeo is supported by substantial evidence, and his decision is sufficiently specific to make clear to Plaintiff and the Court the weight given to the statement and the reason for assigning that weight.

## VI. CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 17) should be DENIED, and Defendant's Motion for Summary Judgment (docket no. 21) should be GRANTED.

### REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: September 30, 2013        s/ Mona K. Majzoub
                                                 MONA K. MAJZOUB
                                                 UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

       I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: September 30, 2013        s/ Lisa C. Bartlett
                                                 Case Manager